JONATHAN SMALE, Oregon Bar No. 091518
Field Jerger LLP
American Bank Building
621 SW Morrison Street, Suite 510
Portland, OR 97205
(503) 542-2015
jonathan@fieldjerger.com

MICHAEL RAY HARRIS, *pro hac vice to be submitted* (Colorado Bar No. 35395)
Friends of Animals
Western Region Office
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
(720) 949-7791
michaelharris@friendsofanimals.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| FRIENDS OF ANIMALS, a New York not-for-profit corporation,<br>      Plaintiff,<br>v.<br><br>JEFFREY ROSE, in his official capacity as the Burns District Office Manager,<br><br>and<br><br>THE UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>   Defendants.<br>_____ | Case No:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      When it comes to managing America's wild horses, the law is quite clear—
the United States Bureau of Land Management (BLM) must ensure that each herd subject to
the Wild Free-Roaming Horses and Burros Act (WHBA) remains a viable, self-sustaining
population of healthy animals and that the herd is kept as an integral part of the natural
system of federal public lands. To meet this goal and others, the WHBA mandates that all
management activities be at the "minimal feasible level" and only authorizes the
permanent removal of wild horses if BLM determines that the horses are excess and
removal is necessary.

2.      BLM has failed miserably at living up to its legal obligation to the wild horses,
that for generations, have made their home in the Warm Springs Herd Management (HMA)
in Eastern Oregon.

3.      In October 2018, BLM conducted a massive removal of wild horses from the
Warm Springs HMA as the first step of a highly controversial and risky surgical sterilization
experiment. Although a federal court partially enjoined the experiment, and the Interior
Board of Land Appeals vacated the decision approving the experiment, BLM for months
failed to return any of the removed horses to the range. It was not until April 12, 2019, that
BLM issued any decision record justifying its decision and declaring that 779 of the wild
horses were excess and should not be returned to the range (hereinafter, "2019 Removal
Decision"). The 2019 Removal Decision admitted that 66 wild horses were not excess but
granted BLM discretion to hold those horses indefinitely and set a plan to administer
fertility control to any mares that it did return. BLM did not conduct a new environmental
analysis for its decision to permanently remove these animals or administer fertility
control to the horses it returns.

4.      Through the 2019 Removal Decision, BLM leaves the Warm Spring Wild
Horse population well below any population size of effective a breeding animals that BLM

COMPLAINT

has recommended in past decisions. Moreover, between the massive reduction in total population size and the decision to utilize birth control agents, like the pesticide porcine zona pellucida (PZP), BLM has created a population that is not healthy or self-sustaining as required by law. Instead, the Warm Springs horses are effectively being managed as a non-breeding herd whose population will be aggressively controlled and manipulated by the BLM. This is in no way true to the free-roaming nature of wild horses that Congress, and the American people, wished to be preserved under the WHBA.

5.     The 2019 Removal Decision not only leaves the wild horse population susceptible to inbreeding, disease, and eradication, it also violates the WHBA, the National Environmental Policy Act (NEPA), and the Federal Land Management and Policy Act (FLPMA).

6.     Compounding its failure to legally protect the Warm Springs wild horses, BLM has now issued a new rule that virtually eliminates public participation in decisions about how to manage these and other wild horses in the future. *See* Permanent Instruction Memorandum (PIM) 2019-004, Issuance of Wild Horse and Burros Gather Decisions (hereinafter, "New Rule").

7.     For decades now, the public has played an important role in assuring that (1) BLM is fully informed about the potential ramifications to the horses from its proposed management decisions, and (2) that the courts act as a check to prevent bad decisions that do not pass legal muster from going into effect.

8.     Contrary to BLM's claim that the New Rule ensures the public has an opportunity to meaningfully participate in wild horse and burro management decisions, the New Rule significantly undermines public participation.

9.     First, the New Rule directs BLM to eliminate public participation for each roundup by issuing a single decision to cover multiple years and removing the requirement for NEPA analysis when implementing long-term plans. According to the New Rule, if BLM

COMPLAINT

issues a multi-year or open-ended wild horse and burro management decision, then no further NEPA analysis is required to continue implementing actions impacting wild horses. This is a stark change from BLM's long-standing decision to provide public participation in most on-the-ground roundup activities, not just on broad, long-term management decisions.

10.     Second, the New Rule reduces the amount of time parties have to seek review of a decision before it is implemented from 31 to 76 days prior to initiation of the roundup, to 14 days.

11.     This rule not only eliminates critical public participation in the wild horse and burro program, BLM also issued it in violation of the Administrative Procedure Act (APA). BLM failed to provide the public notice of the New Rule before implementing it, nor did BLM solicit comments on the New Rule as required by the APA. Finally, BLM failed to acknowledge or offer a reasonable explanation for the rule change.

12.     Thus, Friends of Animals requests that this Court vacate the 2019 Removal Decision and the New Rule, and order the return of wild horses that BLM is holding in violation of the law.

**PARTIES**

13.     Friends of Animals is a nonprofit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals works to cultivate a respectful view of nonhuman animals, free-living and domestic. Friends of Animals' goal is to free animals from cruelty and institutionalized exploitation around the world. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, social media, and other public reports. Friends of Animals is a leading organization advocating for the preservation of wild horses on public lands. Friends of Animals has published numerous articles on wild horses and BLM's management policies. Friends of Animals' members regularly view, photograph, and

4

COMPLAINT

study wild horses on public lands. Friends of Animals regularly advocates for the right of wild horses to live freely on public land, and for more transparency and accountability in BLM's "management" of wild horses and burros. Friends of Animals regularly reviews and distributes information from BLM about management activities impacting wild horses burros and submits comments on such activities.

14.     Friends of Animals and its members regularly view, photograph, and study wild horses. Friends of Animals and its members have a significant interest in the wild horses in the Warm Springs HMA as well as the wild horses removed from the Warm Springs HMA in October 2018. Friends of Animals and its members also have a significant interest in BLM's wild horse management decisions that are subject to the New Rule. The New Rule deprives Friends of Animals of information and impairs its ability to carry out activities and services essential to its mission, including its ability to inform its members of wild horse management activities and participate in the decision making process.

15.     Defendant, JEFFREY ROSE, is the District Manager of BLM's Burns District Office. Defendant Rose oversees wild horse management activities in the Warm Springs HMA. Defendant Rose authorized the April 2019 Warm Springs Decision.

16.     Defendant BUREAU OF LAND MANAGEMENT is an agency located within the Department of the Interior. The mission of the BLM is "[t]o sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." The agency administers over 247 million surface acres of public lands, most of which are located in twelve western states. BLM is responsible for ensuring that federally-administered actions comply with the requirements of all federal laws.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under NEPA, a

COMPLAINT

federal statute. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant.

18.     This Court has authority to grant Plaintiff's requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

19.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e), as Defendants maintain offices in this district. Additionally, a substantial part of the events giving rise to the claims occurred in this judicial district, as the challenged Decision Record was issued by the BLM's Burns District Office, which is located in this judicial district. This case is properly filed in the Pendleton Division pursuant to LR 3-2 because Harney County is located within this Division.

## STATUTORY BACKGROUND

### A.      The Wild Free-Roaming Horses and Burros Act.

20.      In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331 *et seq.*, finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331. Upon finding this, Congress stated its policy was that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death, and to accomplish this they are to be considered in the area where presently found as an integral part of the natural system of public lands." *Id.*

21.      The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

6

COMPLAINT

Additionally, the WHBA requires management of wild horses and burros to be at "the minimal feasible level." *Id.*

22.     To do so, for each HMA, BLM must: (1) maintain a current inventory of wild horses in the management area; (2) determine the AML of wild horses that the HMA can sustain; and (3) determine the method of achieving the designated AML and managing horses within it. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

23.     BLM must manage wild horses "as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a).

24.      BLM must undertake management activities affecting wild horses "with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c); *see also* BLM Wild Horses and Burros (WHB) Handbook, § 4.1.2.

25.     Free-roaming is defined in the BLM WHB Handbook as wild horses that "are able to move without restriction by fences or other barriers within a HMA."

26.     Behavior, in the biological context, is defined as "the internally coordinated responses (actions or inactions) of whole living organisms (individuals or groups) to internal and/or external stimuli."

27.     When the WHBA was enacted, Congress specifically intended to deter the possibility of "zoo-like" developments.

28.     In limited circumstances, the WHBA allows the removal of wild horses. However, prior to gathering or removing any wild horses from the range, the WHBA requires BLM to make a determination that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). This decision must be based on all information "currently available" to the BLM at the time of the determination. *Id.*

COMPLAINT

29.     The WHBA defines the term "excess" as animals that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

30.     The WHBA mandates that, when BLM is making a determination about whether an overpopulation exists, and action should be taken to remove excess animals, it should consult with various individuals. For example, BLM must consult with "qualified scientists in the field of biology and ecology, some of whom shall be independent of both federal and State agencies," as has been recommended by the National Academy of Sciences, and others that it determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management, and animal husbandry as related to rangeland management. 16 U.S.C. § 1333(a).

31.     The WHBA does not authorize BLM to remove wild horses if it has not made a decision that the animals are excess. It cannot be said that § 1333 authorizes a "program" to remove non-excess animals. *Colo. Wild Horse & Burro Coal., Inc. v. Salazar,* 639 F. Supp. 2d 87, 94 n.14 (D.D.C. 2009).

32.     BLM should conduct management activities affecting wild horses in accordance with approved land use plans. 43 C.F.R. § 4710.1.

33.     BLM management should be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans. 43 C.F.R. § 4710.4.

34.     BLM may establish conditions for the removal of unauthorized livestock from public lands adjacent to or within areas occupied by wild horses to prevent undue harassment of the wild horses. 43 C.F.R. § 4710.6.

**B.      Applicable BLM Directives on Wild Horses.**

35.      BLM's WHB Handbook explains that:

COMPLAINT

Before issuing a decision to gather and remove animals, the authorized officer shall first determine whether excess WH&B are present and require immediate removal. In making this determination, the authorized officer shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory, wild horses and burros located outside the HMA in areas not designated for their long-term maintenance and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a [thriving, natural ecological balance].

BLM WHB Handbook at § 4.3.

36.    According to the BLM WHB Handbook, a minimum population size of 50 effective breeding animals, or a total population size of about 150 to 200 horses, is currently recommended to maintain an acceptable level of genetic diversity within reproducing wild horse populations. BLM WHB Handbook at § 4.4.6.3.

37.    BLM's regulations provide that it can close public lands to grazing use by all or a particular kind of livestock "if necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." 43 C.F.R. § 4710.5.

38.    BLM directives state that an appropriate NEPA analysis and issuance of a decision is required prior to removing wild horses. *See* BLM Removal Manual at § 4720.2.21(C)(6); *see also id.* at § 4720.3 ("[T]he authorized officer shall conduct an appropriate site-specific analysis of the potential environmental impacts that could result from implementation of a proposed gather in accordance with [NEPA].").

39.    BLM's guidance documents also specify that a key element of its analysis will be to make a determination of whether excess wild horses are present that require immediate removal. *Id.* at § 4720.31.

40.    BLM's previous guidelines specified that roundup and removal decisions must be issued 31 to 76 days prior to the start of the proposed roundup. BLM WHB Handbook at §§ 7.1, 7.1.2.2 (2010); BLM Removal Manual at § 4720.36.

9

COMPLAINT

41.    Under certain circumstances, however, BLM may make decisions to roundup and remove wild horses or burros effective upon issuance or on a date specified in the decision. 43 C.F.R. § 4770.3(c); BLM Removal Manual at § 4720.36. These circumstances include decisions "where removal is required by applicable law or is necessary to preserve or maintain a thriving ecological balance and multiple use relationship." 43 C.F.R. § 4770.3(c).

42.    Wild horse management decisions are subject to administrative review through the Interior Board of Land Appeals (IBLA) under provisions of 43 C.F.R. §§ 4.21 and 4.410. Under this authority, long-term decisions cannot be implemented effective upon issuance or on a date specified in the decision. BLM WHB Handbook at § 7.3.3.

43.    One of BLM's primary objectives for wild horse management is "[t]o ensure management activities are carried out at the minimum feasible level necessary to attain the objectives identified in approved land use plans (LUPs) and Herd Management Area Plans (HMAPs) and that free-roaming behavior is maintained." BLM, Wild Free-Roaming Horses and Burros Management Manual MS-4700 (2010) at § 4700.02.

44.    The BLM WHB Handbook defines minimal feasible level of management as the "minimum number of habitat or population management tools or actions necessary to attain the objectives identified in approved [land use plans] and HMAPs for a HMA or HMA complex."

45.    According to BLM's regulations and WHB Handbook, HMAPs establish short and long-term management and monitoring objectives for a specific wild horse herd and its habitat and are prepared with public involvement through a site-specific NEPA process. BLM WHB Handbook at §§ 2.5, 6, Appendix 4. HMAPs identify the actions to be taken to accomplish herd and habitat management objectives, such as identifying and setting objectives for herd composition, animal characteristics, and habitat development needs,

COMPLAINT

and must be in conformance with the applicable LUPs. BLM WHB Handbook, §§ 2.5.2, 6; *see also* 43 C.F.R. § 4710.3-1.

46.     The objectives set forth in an HMAP guide future wild horse management activities in an HMA or complex over the life of the plan. BLM WHB Handbook, Appendix 4.

47.     The purpose of an HMAP is to facilitate on-the-ground implementation of the selected management strategy. The HMAP includes a Monitoring Plan and Tracking Log/Project Implementation Schedule. BLM WHB Handbook, Appendix 4.

48.     Future decisions implementing on-the-ground decisions, such as roundups and removals, must be based on current information, proper NEPA analysis, and public participation. *Id.* §§ 4.3, 4.4.6.4, 7.1, 7.1.2, 7.1.2.1; *see also* BLM Management Considerations Manual, MS-4710 (2010), § 4710.23.; BLM Removal Manual § 4720.3; BLM, National Environmental Policy Handbook, H-1790-1 (2008).

**C.      The National Environmental Policy Act.**

49.     The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., is our nation's basic charter for protection of the environment. 40 C.F.R. § 1500.1(a). NEPA established a landmark national environmental policy which, among other things, encourages environmental protection and informed decision making.

50.     The NEPA process is intended to help agencies make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. 40 C.F.R. § 1500.1(c).

51.     NEPA compliance requires agencies to encourage and facilitate public involvement in decisions which affect the quality of the human environment. 40 C.F.R. § 1500.2(d).

52.     Before a federal agency can act in a way that significantly affects the quality of the human environmental, NEPA requires the acting agency to prepare a detailed Environmental Impact Statement (EIS) that discusses, among other things: "(i) the

COMPLAINT

environmental impact of the proposed action; (2) any adverse environmental effects; [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

53.     The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

54.     Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and requires BLM to consider several factors including: impacts of the action; unique characteristics of the geographic area; the degree to which the effects of on the quality of the environment are likely to be highly controversial; the degree to which the effects on the environment are highly uncertain or involve unknown risks; the degree to which the action may have a precedential effect; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on endangered or threatened species or their critical habitat. 40 C.F.R. § 1508.27(b).

55.     Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

56.     Categorical exclusions (CatEx) are categories of action that federal agencies have determined do not have a significant effect on the quality of the human environment (individually or cumulatively) and for which, therefore, neither an EA nor an EIS is required. 40 C.F.R. § 1508.4. When using a CatEx, other procedural requirements may still

COMPLAINT

apply, such as consultation under the National Historic Preservation Act and the Endangered Species Act.

57.     Before any non-Energy Act Cat Ex is used, agencies must conduct sufficient review to determine if any "extraordinary circumstances" apply. 516 DM 2, Appendix 2; *see also* United States Department of the Interior, Bureau of Land Management, National Environmental Policy Act Handbook, H-1790-1 (hereinafter, "BLM NEPA Handbook") at Appendix 5. If any of the extraordinary circumstances are applicable to the action being considered, either an EA or an EIS must be prepared for the action. 516 DM 2, Appendix 2; *see also* BLM NEPA Handbook, Appendix 5.

58.     NEPA created the Council on Environmental Quality (CEQ) to be the "caretaker" of NEPA. The CEQ issued regulations for implementing the procedural regulations of NEPA. 40 C.F.R. §§ 1500-1508; *see also Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 Fed. Reg. 18026 (March 23, 1981), as amended (1986).

59.     NEPA and the CEQ regulations establish procedures to ensure proper consideration of environmental concerns, but they do not dictate a particular result or decision. BLM NEPA Handbook at § 1.1.

60.     The CEQ regulations also require that agencies "make diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a); *see also* BLM NEPA Handbook at §§ 1.1; 6.9.1.

61.     A proposal for federal action triggers NEPA. The CEQ regulations define major federal actions to include "[a]doption of official policy, such as rules, regulations, and interpretations . . . ." 40 C.F.R. § 1508.18(b)(1); *see also* BLM NEPA Handbook at §§ 3.1; 3.2.1.

62.     According to the CEQ regulations, the adoption of official policy in the form of rules, regulations and interpretations pursuant to the APA, treaties, conventions, or other

COMPLAINT

formal documents establishing governmental or agency policy which will result in or substantially alter agency programs, could require an EIS. 40 C.F.R. § 1508.18; *see also* BLM NEPA Handbook at § 3.2.1.

**D.     The Federal Land Policy and Management Act.**

63.     The Federal Land Policy and Management Act (FLPMA) governs the management of federal public lands. Under FLPMA, BLM must develop land use plans for the public lands under its control. 43 U.S.C. § 1712.

64.     All resource management decisions made by BLM must conform to the approved land use plan. *Id.* § 1732(a), 43 C.F.R. § 1610.5-3(a). To conform to a land use plan, a resource management decision "shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan." 43 C.F.R. §1601.0-5.

**E.     The Administrative Procedure Act.**

65.     The Administrative Procedure Act (APA) governs the internal procedures of administrative agencies, including how they interact with the public. The APA defines an "agency" broadly to mean "each authority of the Government of the United States," unless expressly excluded from the Act. 5 U.S.C. § 551(1).

66.     BLM is not expressly excluded from the APA.

67.     The APA authorizes a reviewing court to "hold unlawful or set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2).

68.     The APA defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

COMPLAINT

69.    The APA defines "rule" to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." *Id.* § 551(4).

70.    The APA defines "rule making" as an "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

71.    Before making a rule, an agency must publish notice of the proposed rule making in the Federal Register, "unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." *Id.* § 553(b).

72.    The notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(1)-(3).

73.    After notice, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." *Id.* § 553(c).

## PROCEDURAL BACKGROUND

74.    On September 12, 2018, BLM issued the final Decision Record and Finding of No Significant Impact for the Warm Springs Spay Feasibility and On-Range Behavioral Outcomes Assessment and Warm Springs Herd Management Area (HMA) Population Management Plan, DOI-BLM-ORWA-B0S0-2018-0016-EA.

75.    The September 2018 Decision Record approved a five-year Sterilization Experiment analyzed in the Environmental Assessment (EA), but did not approve the Ten-Year Population Management Plan analyzed in the 2018 EA. Instead, the September 2018 Decision Record implemented "[t]he portion of the population management plan that provides direction on gathering wild horses in 2018."

COMPLAINT

76.    On October 19, 2018, Friends of Animals filed a Complaint challenging the September 2018 Decision. *Friends of Animals v. Rose*, Case No. 2:18-cv-01850-SU, ECF No. 1.

77.    Pursuant to the September 2018 Decision, in October 2018, BLM rounded up close to 100% percent of the wild horse population in the Warm Springs HMA.

78.    On November 2, 2018, in a separate but related case, the United States District Court for the District of Oregon preliminarily enjoined implementation of the spay portion of the September 2018 Decision Record.

79.    On November 26, 2018, in another separate but related case, the IBLA issued an order vacating the September 2018 Decision Record in its entirety.

80.    In light of the vacated September 2018 Decision Record, on January 30, 2019, Friends of Animals filed its First Amended Complaint challenging BLM's authority to remove, hold, sell, or put up for adoption any of the horses that were removed from the Warm Springs HMA in October 2018.

81.    On February 15, 2019, after Friends of Animals agreed to dismiss its case without prejudice if BLM allowed a 30-day comment period on any new decision, BLM issued a draft Determination of NEPA Adequacy (DNA) for the Warm Springs Herd Management Area Removals to AML, DOI-BLM-ORWA-B050-2019-0009-DNA, for a 30-day public comment period.

82.    On February 28, 2019, Friends of Animals' case was dismissed without prejudice.

83.    On April 12, 2019, BLM issued a final DNA and Decision Record for the Warm Springs HMA. The 2019 Removal Decision determined that the September 2018 EA adequately addressed the permanent removal of 779 wild horses, 2 mules, and 41 burros removed in the October 2018 roundup. BLM also determined that, when certain specific criteria were met, BLM may return approximately 66 wild horses to Warm Springs HMA between June and November 2019. However, BLM made no commitment to do so, and

16

COMPLAINT

instead reserved the right to issue new management decisions that could rescind, nullify, set aside, supersede, or adopt the April 2019 Decision.

84.    According to the 2019 Removal Decision, a new management decision could affect **whether** wild horses are returned and/or **when** wild horses are returned. BLM has instead retained the right to effectively shirk its legal obligation to return wild horses to Warm Springs HMA.

FACTUAL BACKGROUND

A.    **The Warm Springs Herd Management Area.**

    1.    **Overview of The Warm Springs Herd Management Area.**

85.    The Warm Springs HMA is located in Harney County, Oregon, approximately 25 air miles southwest of Burns, Oregon.

86.    The Warm Springs HMA is within the administrative boundaries of BLM's Burns District Office.

87.    The Warm Springs HMA contains approximately 474,547 acres of BLM-managed land.

88.    In 1971, when Congress passed the WHBA, wild horses were present in and around the area now designated as the Warm Springs HMA.

89.    The appropriate management level (AML) for the Warm Springs HMA was established in the 1979 Warm Springs Equine Herd Management Area Plan (Warm Springs HMAP) as a range of 111 to 202 wild horses, which includes a population of 15 to 35 burros. According to the Warm Springs HMAP, the Warm Springs HMA encompassed 468,360 acres of public, state, and private lands. The Warm Springs HMA also discusses the construction of an east-west division fence in fall 1977.

90.    The 1987 Drewsey, Andrews and Riley Management Framework Plan (MFP) Amendment resulted in a land use plan (LUP) decision that maintained the AML in the Warm Springs HMA at 111 to 202.

17

COMPLAINT

91.     Following the LUP Amendment, an update to the Warm Springs HMAP occurred in December 1987, and established an objective to "[m]aintain a viable herd of 111 to 202 wild horses . . . [b]urros are still found in the west unit but no management objectives nor plans have been identified."

92.     The AML was again maintained as 111 to 202 wild horses, including 15 to 35 burros, in the 1992 Three Rivers Resource Area Management Plan (RMP) and Record of Decision (Three Rivers RMP/ROD).

93.     According to the Three Rivers RMP/ROD, wild horses in the Warm Springs HMA are allocated 2,424 animal unit months (AUMs). According to BLM, this equates to an AML of 96 to 178 wild horses.

94.     In the 2010 Warm Springs HMAP Update, the most recent Warm Springs HMAP Update, BLM again maintained the established AML range of 111 to 202 wild horses, including 15 to 35 burros.

95.     Overall, forage has not been an issue for wild horses in the Warm Springs HMA. Although water is a limiting factor, water sources are found across the HMA.

96.     Following a 2010 roundup, E. Gus Cothran from Texas A&M University, summarized that the genetic variability of this herd, in general, is on the high side but there was a high percentage of variation at risk, heterozygosity levels had declined since 2001. Additionally, comparison of two years of data indicated that diversity was in decline.

97.     Two separate livestock grazing allotments with seven individual livestock grazing permits are within the Warm Springs HMA.

**2.      The 1992 Three Rivers Resource Management Plan and Record of Decision.**

98.     According to the 1992 Three Rivers RMP/ROD, specific management actions arising from RMP decision will be compared with the RMP objectives to ensure consistency

COMPLAINT

with the intent of the plan, and formal plan evaluations will take place at intervals not to exceed five years.

99.     The stated objective and rationale of the wild horse program in the 1992 Three Rivers RMP/ROD is to "[m]aintain healthy populations of wild horses" within the Warm Springs HMA.

100.    According to the 1992 Three Rivers RMP/ROD, the Warm Springs HMA encompasses 456,855 acres and 2,424 AUMs were allocated to the Warm Springs wild horses.

101.    According to the 1992 Three Rivers RMP/ROD, herd population inventories are to be conducted on an annual basis.

102.    According to the 1992 Three Rivers RMP/ROD, AMLs are to be based on the analysis of trend in range condition, utilization, actual use, and other factors.

103.    According to the 1992 Three Rivers RMP/ROD, NEPA documentation must be prepared "prior to any adjustments in population levels."

104.    According to the 1992 Three Rivers RMP/ROD, monitoring requirements include (1) annual collection of utilization, actual use, and climate reports; (2) long and short-term trend in range condition studies conducted every three to five years; and (3) wild horse use area mapping and reporting.

105.    The 1992 Three Rivers RMP/ROD directs BLM to enhance the management and protection of the herds in the Warm Springs HMA.

106.    The 1992 Three Rivers RMP/ROD directs BLM to provide facilities and water sources necessary to ensure the integrity of the individual herds.

107.    The 1992 Three Rivers RMP/ROD directs BLM to enhance and perpetuate the special or rare and unique characteristics that distinguish the respective herds.

COMPLAINT

108.    The 1992 Three Rivers RMP/ROD specifies that permanent adjustments to the wild horse and burro population should not be lower than the established minimum AML in order to maintain viability.

109.    According to the 1992 Three Rivers RMP/ROD, roundups must be based on current monitoring and other data.

**3.    The September 2018 Decision.**

110.    On June 29, 2018, BLM issued a draft EA for the Spay Feasibility and On-Range Behavioral Outcomes Assessment and the Warm Springs HMA Population Management Plan, DOI-BLM-ORWA_B0S0-2018-0016-EA (Draft 2018 EA).

111.    The Draft 2018 EA identified a Sterilization Experiment proposed by the United States Geological Survey (USGS) and Colorado State University (CSU) in cooperation with BLM's Burns District Office.

112.    The Draft 2018 EA proposed to allow the USGS and CSU to evaluate the safety, complication rate, and feasibility of ovariectomy via colpotomy on wild horse mares and the impacts to mare and band behavior on the range as compared with an untreated herd.

113.    The Draft 2018 EA included two alternatives: No action (Alternative A) and the Proposed Action (Alternative B).

114.    The Proposed Action included two distinct phases: (1) the Sterilization Experiment (2018-2022) and (2) the Ten-Year Plan (2018-2028). Implementation of the Proposed Action would begin in the Fall of 2018.

115.    According to the Draft 2018 EA, the Warm Springs HMA was selected for this experiment because it is divided into two large pastures with one main fence down the middle. Each side has comparable topographical, vegetative, and watering features. For the experiment, one side of the HMA would be the control segment with no sterilized mares,

20

and the other side would be the treatment segment with treated mares. Each side would have a total of 100 horses.

116.    According to the Draft 2018 EA, the Proposed Action would begin with a helicopter roundup of all of the horses—100 percent of the population—within and around the Warm Springs HMA.

117.    According to the Draft 2018 EA, all of the wild horses would then be transported to the Oregon Wild Horse Corrals Facility. Wild horses would then be selected for the experiment and kept separate from the other horses at the corrals. All horses returned to the HMA would receive an individual freeze mark on their neck as well as a freeze mark on their left hip.

118.    According to the Draft 2018 EA, BLM would then transport horses back to the Warm Springs HMA and put 100 horses on one side of the HMA (the control side) and 100 horses on the other side of the HMA (the treated side).

119.    According to the Draft 2018 EA, approximately 28 to 34 mares would receive an ovariectomy and be returned to the Warm Springs HMA approximately seven days later.

120.    In conjunction with the proposed Sterilization Experiment, BLM also proposed a ten-year population management plan for the Warm Springs HMA.

121.    The proposed Ten-Year Plan included the proposed Sterilization Experiment, and additional roundups and removals of wild horses over a ten-year period.

122.    Specifically, following the completion of the Sterilization Experiment and during the remainder of the ten-year timeframe of this plan, BLM would conduct additional helicopter roundups whenever the AML is exceeded.

123.    The first roundup following the Sterilization Experiment would be scheduled for 2022 and was estimated to be approximately 111 wild horses and burros. Subsequent roundup numbers would be determined at the time of the roundup. If, for any reason, BLM

21

COMPLAINT

could not conduct a roundup in 2022, it would roundup wild horses "regardless of population size" at any time.

124.    According to the Draft 2018 EA, BLM would utilize two methods of fertility control for wild horse mares over the life of the ten-year plan: porcine zona pellucida (PZP) and ovariectomy via colpotomy.

125.    According to the Draft 2018 EA, if BLM determines that sterilizing horses via ovariectomy is not a proper management tool, BLM would utilize PZP as a management tool. If it determines that sterilizing horses via ovariectomy is a proper management tool, it will continue to conduct the surgeries through the life of the plan and possibly beyond.

126.    According to the Draft 2018 EA, following the completion of the Sterilization Experiment, BLM would assess whether analysis in its EA adequately supports future actions (i.e. ovariectomies or PZP) or if BLM needs to prepare new or supplemental analysis.

127.    BLM received a total of 8,326 comment emails, letters, and faxes on the Draft EA, including a comment letter from Friends of Animals.

128.    On August 8, 2018, CSU withdrew from the proposed Sterilization Experiment.

129.    On August 22, 2018, less than two weeks after CSU withdrew from the Sterilization Experiment, BLM issued an Updated Draft 2018 EA for public comment. BLM provided only twelve days for the public to submit comments on the Updated Draft EA.

130.    The Updated Draft 2018 EA provided that BLM would be responsible for the roundups, contracting veterinarians to conduct ovariectomy via colpotomy, and monitoring the mortality and morbidity rates of mares treated. USGS also would be responsible for radio collaring and tagging horses, studying herd genetics, and on-range behavioral observations.

COMPLAINT

131.    According to the Updated Draft 2018 EA, the experiment would no longer include a professor of equine surgery, an animal welfare specialist, and a research scientist.

132.    Additionally, the veterinarians performing the ovariectomy via colpotomy would be contracted by BLM rather than CSU.

133.    The Updated Draft 2018 EA eliminated the post-surgery pain and welfare observations that would have been conducted by a CSU animal welfare specialist with the purpose of quantifying a measure of pain and discomfort in mares after surgery.

134.    According to the Updated Draft 2018 EA, the information that would have been gathered during the post-surgery pain and welfare observations will instead be evaluated by the BLM-contracted veterinarian.

135.    On August 30, 2018, Friends of Animals submitted supplemental comments detailing its concerns and urging BLM to cancel this experiment altogether.

136.    On September 12, 2018, just a little over a month after CSU withdrew from the Sterilization Experiment and only ten days after comments on the Updated Draft 2018 EA were due, BLM issued a Decision Record, a final environment assessment (Final 2018 EA), and a Finding of No Significant Impact.

137.    According to the September 2018 Decision Record, BLM decided to implement a modified version of the proposed action (Alternative B), which includes: (1) the Sterilization Experiment and (2) the portion of the population management plan that provides direction on rounding up wild horses in 2018.

138.    The September 2018 Decision Record did not include the ten-year population management plan portion of the EA's proposed action.

139.    The portion of the population management plan that provides direction on rounding up wild horses from the Warm Springs HMA in 2018 expressly states that, as part of the Sterilization Experiment, the fall 2018 action "would be to gather by helicopter up to

23

COMPLAINT

100 percent of the total wild horse population, and remove excess horses down to 200, which is the sample size needed for the on-range behavioral study."

140.    The September 2018 EA did not analyze a new or updated HMAP. Instead, the 2018 EA incorporates the previously updated 2010 HMAP.

141.    Beginning on October 2, 2018, approximately 20 days after the Final EA, Decision Record, and Finding of No Significant Impact were issued, BLM used helicopters to roundup and remove 845 wild horses, 2 mules, and 41 burros from the Warm Springs HMA and transported the animals to the Oregon Wild Horse Corral Facility in Hines, Oregon. At least 32 wild horses were killed during the operation.

### 4.    Legal Challenges to the 2018 Warm Springs Decision.

142.    Friends of Animals originally brought an action against the BLM and Jeffrey Roes to challenge the September 12, 2018 Decision Record and Finding of No Significant Impact for the Warm Springs Spay Feasibility and On-Range Behavioral Outcomes Assessment and Warm Springs Herd Management Area Population Management Plan.

143.    In a separate, but related, case concerning the Decision, on November 13, 2018, the District Court for the District of Oregon, Portland Division, issued an Order granting Plaintiffs' Motion for a Preliminary Injunction with regards to their claim under the First Amendment and their claim under the APA that BLM's failure to explain why it was not assessing the social acceptability of its procedures was arbitrary and capricious. Order of Preliminary Injunction, *Kathrens v. Zinke*, No. 3:18-cv-01691-MO (D. Or. Nov. 13, 2018), ECF 24. The Court granted the preliminarily injunction and enjoined BLM from undertaking the sterilization procedure until further notice.

144.    In yet another separate, but related, trio of appeals before the IBLA concerning the Decision, on November 26, 2018, the IBLA granted BLM's Motion to Vacate and Remand the Decision. Order, Appeals Consolidated; Motion to Vacate and Remand Granted, IBLA 2019-14, -15, and 29 (IBLA 2018). The IBLA based its decision on the

COMPLAINT

District Court for the District of Oregon's Order granting the preliminary injunction and therefore vacated BLM's September 2018 Decision Record in its entirety and remanded it back to BLM.

145.    Because the September 2018 Decision Record was vacated in its entirety, Friends of Animals agreed to dismiss its case without prejudice if BLM agreed to allow for a 30-day comment period on any new decision pertaining to BLM's decision to continually hold wild horses and burros removed pursuant to the 2018 Decision Record. Accordingly, after BLM issued a draft DNA pertaining to the permanent removal of the majority of wild horses, Friends of Animals dismissed its case without prejudice.

**5.    The April 12, 2019 Warm Springs DNA and 2019 Removal Decision.**

146.    On February 14, 2019, BLM issued a draft Warm Springs Herd Management Area Removals to AML Determination of NEPA Adequacy (DNA) for public comment.

147.    The Draft DNA, relied on the 2018 Warm Springs EA to serve as its analysis of the 2019 Removal Decision that: (1) determined approximately 779 wild horses, 2 mules, and 56 burros rounded up in October 2018 should be permanently removed from the Warm Springs HMA; (2) proposed the return of male and female horses (50/50 sex ratio) to low end of AML for the Warm Springs HMA in 2019; and (3) proposed the dosing of all mares returned to the HMA with the pesticide PZP.

148.    According to the draft DNA, under the proposed action, wild horses and burros permanently removed during the 2018 roundup would be "prepared for adoption, sale, or transfer programs as described in the 2018 EA, absent a different decision record being approved."

149.    According to the draft DNA, an estimated 30 wild horses and 30 burros remained within the Warm Springs HMA following the 2018 roundup. The estimated number of horses and burros remaining on the range was derived from pre-roundup

COMPLAINT

population estimates coupled with the pilot's counts during the final days of the 2018 roundup.

150.    According to the draft DNA, BLM proposed the return of approximately 66 wild horses between June and November 2019 in order to reestablish AML. However, BLM claimed it retained discretion to adjust or withdraw the decision to return wild horses.

151.    According to the draft DNA, the return of approximately 66 wild horses is dependent upon the following factors: (1) HMA accessibility due to road conditions; (2) the potential threat of wild fire; (3) the age of foals born in captivity; (4) adequate water; and (5) foaling and breeding season (March 1 through June 30).

152.    According to the draft DNA, BLM declined to return mares that were not pregnant at the time of the 2018 roundup.

153.    According to the draft DNA, BLM decided not to return any of the burros removed in the 2018 roundup to the Warm Springs HMA.

154.    According to the draft DNA, the June 2019 survey will "confirm the estimated number of horses remaining on the range and finalize the number of horses being returned."

155.    According to the draft DNA, BLM further decided to dose all mares returned to the Warm Springs HMA with the pesticide PZP.

156.    According to the draft DNA, "[t]he proposed action in this DNA does not include the spay feasibility and on-range behavioral outcomes assessment portion of the proposed action in the 2018 EA, nor does it include the full 10-year population management plan portion of the proposed action."

157.    According to the draft DNA, "BLM retains the right to issue new management decisions pertaining to these horses that could rescind, nullify, set aside, supersede, or adopt this potential decision record in whole or in part. A new management decision could affect, among other things: (1) whether, and when, horse are returned to the HMA; (2)

26

COMPLAINT

BLM's excess determination; and (3) the population control measures that BLM chooses to utilize."

158.    Friends of Animals submitted comments on the draft DNA on March 17, 2019.

159.    Friends of Animals and others noted their concern that BLM retained the right to issue new management decisions that could rescind, nullify, set aside, or supersede the DNA.

160.    Friends of Animals and others commented that BLM's commitment to return 66 wild horses to the Warm Springs HMA in 2019 is left dependent upon multiple factors rather than making a more specific commitment to return wild horses to the HMA, including mares that have not been dosed with PZP and thus was not in compliance with the law.

161.    Friends of Animals and others commented that the 2018 EA does not adequately analyze the permanent removal of 779 wild horses, 2 mules, and 41 burros.

162.    Friends of Animals and others commented that dosing all of the returned mares with PZP could create a very minimally reproducing herd and cause negative impacts on population growth rate and genetic variability.

163.    Friends of Animals and other commented that the 2018 EA did not adequately analyze the permanent removal of wild horses, the return of wild horses removed in October 2018, and the application of PZP to all mares returned to the Warm Springs HMA.

164.    Friends of Animals and others commented that the 2018 EA analyzed the return of 200 wild horses beginning in March (at the beginning of the foaling season) and therefore BLM should return at least 200 horses to Warm Springs HMA starting in Spring 2019, or in the alternative, consider a phased approach.

COMPLAINT

165.    Friends of Animals commented that BLM relies on additional rangeland monitoring documents that were not cited in the 2018 EA, but BLM failed to provide these documents to the public for review.

166.    Friends of Animals and others commented that the 2018 EA does not analyze the effects of keeping horses in captivity for an extended period of time.

167.    Friends of Animals and others commented that BLM should consider reducing the number of AUMs allotted to livestock in the Warm Springs HMA.

168.    Friends of Animals and other commented that BLM should consider managing wild horses using natural means, such as protecting predators.

169.    Friends of Animals and other commented that BLM should formally re-evaluate the AMLs and adjust AMLs based on monitoring data.

170.    Others commented that, according to Warm Springs HMAPs, the east unit of Warm Springs HMA should be managed at 50 to 100 horses while the west until must be managed at 61 to 102 horses, and by returning only 66 wild horses, BLM is failing to comply with its existing HMAPs and resource management plans.

171.    Friends of Animals commented that, according to the Warm Springs HMAP, the Warm Springs HMA should be managed for a breeding population of between 50 to 142 wild horses with a sex ratio of 50% mares and 50% studs. By returning only mares dosed with PZP, BLM is not complying with its obligations.

172.    Friends of Animals and others commented that BLM's guidance recommends a minimum total population size of about 150 to 200 wild horses, and by severely restricting the herd's ability to reproduce, the herd will be genetically unviable and at risk for inbreeding.

173.    Friends of Animals and others commented that the DNA does not guarantee that low AML will be met because BLM is relying on imprecise population estimates.

28

COMPLAINT

174.    On April 12, 2019, BLM issued the final Warm Springs Herd Management Area Removals to AML DNA and associated Decision Record.

175.    BLM did not incorporate any of Friends of Animals proposed comments into the final DNA.

176.    The final DNA made only two changes from the draft DNA: (1) updated the DNA to specify the aerial survey method to be performed in June 2019, and (2) revised the opening sentence listing the factors that BLM will rely upon when deciding whether and when to return wild horses.

177.    According to the Decision Record: "Due to the limited water availability in the HMA and deteriorating conditions of the natural surface roads being used for hauling water during later summer 2018, the portion of the September 12, 2018 DR authorizing the gather became effective upon issuance."

178.    According to the Decision Record, "[t]he effective date of this decision is 14 days from the date of the authorized officer's signature on this document."

**B.    Permanent Instruction Memorandum 2019-004 (New Rule).**

179.    On March 15, 2019, BLM issued Permanent Instruction Memorandum (PIM) 2019-004 with the subject line "Issuance of Wild Horse and Burro Gather Decisions."

180.    According to the New Rule, the memorandum "establishes policy and guidance for the issuance of [wild horse and burro] gather decisions and NEPA compliance."

181.    The New Rule supersedes Instruction Memorandum (IM) 2010-130 and amends Chapter 7 of BLM's Wild Horse and Burro Management Handbook, which directed that wild horse and burro roundup decision be issued 31 to 76 days prior to initiating roundup activities. BLM WHB Handbook at §§ 7.1 (Figure 7.1), 7.1.2.2.

182.    The New Rule directs BLM to issue signed roundup decisions only 14 days prior to the proposed roundup start date rather than adhering to the former commitment

COMPLAINT

to issue signed roundup decisions 31 to 76 days prior to the proposed start date of the roundup.

183.    According to the New Rule, "[t]he intent of the 31-76 day lead time was to allow opponents of the gather decision to pursue an administrative challenge before going to Federal Court."

184.    According to the New Rule, because opponents of roundup decisions often pursue temporary restraining orders or preliminary injunctions, the 31 to 76 day lead time "did not achieve the intended purpose" and "impeded management capabilities by reducing decision-making flexibility."

185.    The New Rule further directs BLM to analyze in an EA all available roundup methods and present multiple management alternatives, including "fertility control vaccine treatments; spay and neuter procedures; removal of excess animals only; release or relocation of selected animals; and any other action integral to achieving and maintaining the [AML]."

186.    The New Rule also directs BLM to analyze in an EA "the effects of multiple gathers and other population control actions over a multi-year period."

187.    The New Rule provides instruction only as far as EA's are concerned and does not provide instruction for situations in which an EIS is required.

188.     The New Rule directs BLM to make roundup decisions available for public review and comment for 30 days, except when an emergency or "other relevant management considerations" exist.

189.    The New Rule does not define situations that may be considered "other relevant management considerations."

190.    The New Rule does not direct BLM to provide the public with notice and opportunity to comment on a Determination of NEPA Adequacy (DNA). *Contra* BLM WHB Handbook at § 7.2 ("The authorized officer shall make Gather Plan EAs and DNAs available

COMPLAINT

to interest individuals, groups, and agencies for a 30-day review and comment period, except when an emergency situation exists.").

191.    The New Rule directs BLM to consider substantive comments and include a summary of how the comments were address in the final NEPA document.

192.    The New Rule does not direct BLM "to consider substantive comments and summarize how they were addressed in the NEPA document or DNA for the gather plan." BLM WHB Handbook at § 7.2. The New Rule also does not direct BLM to present the summary in the NEPA document, the DNA, or the decision document. *Id*.

193.    The New Rule further directs BLM to consider "preparing a focused EA or utilizing a categorical exclusion" when an emergency situation exists.

194.    BLM's NEPA handbook does not list wild horse removals due to an emergency on its list of actions that may utilize a categorical exclusion. BLM NEPA Handbook, H-1790-1, at Appendix 4.

195.    The New Rule claims that issuing a roundup decision 14 days prior to the planned gather start date ensures the public has an opportunity to meaningfully participate in WHBA management decisions.

196.    The New Rule directs BLM to "issue decisions authorizing gathers, removals, or population control actions through a phased approach or over a multi-year period" in order to provide BLM with "sufficient time to achieve management objectives" and to "enhance agency flexibility by allowing BLM to adapt to unforeseen circumstances."

197.    The New Rule does not adhere to its former direction requiring BLM to prepare a NEPA analysis prior to every roundup.

198.    According to the New Rule, if BLM "issues a multi-year or open-ended decision to gather and manage [wild horses and burros] on the public lands, then no further decision is required to continue implementing the action unless the BLM

31

COMPLAINT

determines that a change in conditions or objectives requires a new NEPA analysis and decision."

## CLAIMS

### FIRST CAUSE OF ACTION
### (VIOLATIONS OF THE WILD FREE-ROAMING HORSES AND BURROS ACT)

199.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

200.    On the above facts and legal obligations, BLM violated the WHBA and its implementing regulations by failing to preserve wild horses in their wild and free-roaming state as an integral part of the natural system of the public lands, and failing to undertake management activities affecting wild horses with the goal of maintaining free-roaming behavior.

201.    On the above facts and legal obligations, BLM violated the WHBA and its implementing regulations by failing to manage wild horses at the minimum feasible level.

202.    On the above facts and legal obligations, BLM violated the WHBA and its implementing regulations by removing and continually holding 888 animals prior to making a proper determination that the animals were excess, and removal was necessary.

203.    On the above facts and legal obligations, BLM violated the WHBA and its implementing regulations by failing to conduct management activities affecting wild horses in accordance with approved land use plans, which require that NEPA documentation be prepared prior to any roundup or removal action and that all roundup and removal actions be based on current data.

32

COMPLAINT

204.    Defendants' April 2019 Decision and continued holding of wild horses and burros is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT: Failure to Conduct Notice and Comment Rulemaking)

205.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

206.    In issuing the New Rule, BLM issued a rule that creates rights and duties. The New Rule changes the criteria for issuing decisions, creates specific obligations that undermine public participation, and establishes new policies and procedures.

207.    In issuing the New Rule, BLM failed to comply with the notice and comment rulemaking requirements of the APA.

208.    In issuing the New Rule, and revoking previous policies, BLM's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the New Rule should be set aside under the APA, 5 U.S.C. § 706.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT: Failure to Provide a Reasoned Explanation for Rule Change)

209.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

210.    On the above facts and legal obligations, BLM changed its rules on issuing wild horse and burro roundup decisions without providing an adequate, reasoned explanation.

COMPLAINT

211.    In issuing the New Rule, BLM abruptly changed its previous rules that, among other things, required BLM to issue management decisions 31 to 76 days before a proposed roundup and required BLM to issue a site-specific NEPA document prior to each roundup.

212.    BLM claimed the New Rule ensures that the public has an opportunity to meaningfully participate in management decisions. However, the New Rule significantly undermines the public's ability to meaningfully participate by allowing BLM to continually implement decisions for an infinite period of time into the future without an obligation for further public participation.

213.    BLM did not acknowledge this rule change or provide a reasonable explanation for issuing the New Rule.

214.    By issuing the New Rule that directs BLM to issue removal decision only 14 days prior to removal and directing BLM to issue multi-year and open-ended decisions without any further NEPA analysis, and doing so without adequate explanation, BLM's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the New Rule should be set aside under the APA, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION
## (VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT)

215.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

216.    The roundup of 845 wild horses, 2 mules, and 41 burros from the Warm Springs HMA, and continued holding of these animals is a major federal action subject to NEPA.

217.    BLM did not prepare an environmental assessment or an environmental impact statement analyzing the permanent removal of 888 animals and the administration of fertility control to wild mares it may return.

COMPLAINT

218.    BLM improperly relied on the 2018 EA that BLM prepared for the Sterilization Experiment.

219.    BLM failed to take a hard look at the impacts of actions authorized by the 2019 Removal Decision.

220.    On the above facts and legal obligations, BLM violated NEPA by failing to consider a reasonable range of alternatives, including returning at least 200 wild horses to the Warm Springs HMA.

221.    In issuing the 2019 Removal Decision, BLM failed to adequately respond to public comments thereby failing to engage in informed decision making and informed public participation as required by NEPA.

222.    In issuing the 2019 Removal Decision without fostering informed decision making and informed public participation or taking a hard look at the impacts and alternatives, Defendants actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedures, and should be set aside under the APA, 5 U.S.C. § 706.

**FIFTH CAUSE OF ACTION**
**(VIOLATIONS OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT)**

223.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

224.    BLM no authority to manage wild horses below the established AML.

225.    On the above facts and legal obligations, BLM violated FLPMA by disregarding its duty to act in compliance with applicable land use plans.

226.    Defendants are acting in conflict with their obligations pursuant to applicable land use plans to: maintain healthy populations of wild horses and burros in the Warm Springs HMA; enhance the management and protection of herd areas and the herd; enhance and perpetuate the special or rare and unique characteristics that distinguish the

COMPLAINT

Warm Springs herd; "maintain" the healthy, free-roaming nature of wild horses and burros within the Warm Springs HMA; maintain the minimum population level, and prepare NEPA documentation prior to any roundup or removal action.

227.    On the above facts and legal obligations, Defendants' permanent removal, continued holding, adoption, or sale of wild horses removed from the Warm Springs HMA is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law or procedure, and must be set aside under the APA, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A. Declare that Defendants' April 2019 Removal Decision violates the Wild Free-Roaming Horses and Burros Act and the Administrative Procedure Act;

B. Declare that Defendants' actions issuing the New Rule are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the Administrative Procedure Act;

C. Declare that Defendants' April 2019 Removal Decision violates the National Environmental Policy Act and the Administrative Procedure Act;

D. Declare that Defendants' April 2019 Removal Decision violates the Federal Land Policy and Management Act and the Administrative Procedure Act;

E. Enjoin any action previously authorized by the April 2019 Removal Decision at issue in this case unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

F. Enjoin Defendants from applying the New Rule to wild horse and burro management decisions until such time as BLM has complied with the law;

G. Enjoin Defendants from implementing any future management actions within Warm Springs HMA unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

H. Order Defendants to return wild horses and burros that have been removed from the Warm Springs HMA in violation of the law;

COMPLAINT

I.  Award Plaintiff reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 et seq., and/or all other applicable authorities; and/or

J.  Grant such further relief as the Court deems just and equitable.


Dated: June 5, 2019                      Respectfully submitted,

                                         /s/ Jonathan Smale
                                         JONATHAN SMALE, Oregon Bar No. 091518
                                         Field Jerger LLP
                                         American Bank Building
                                         621 SW Morrison Street, Suite 510
                                         Portland, OR 97205
                                         (503) 542-2015
                                         jonathan@fieldjerger.com

                                         Michael Ray Harris, *pro hac vice to be submitted*
                                         Friends of Animals
                                         Wildlife Law Program
                                         7500 E. Arapahoe Road, Suite 385
                                         Centennial, CO 80112
                                         (720)949-7791
                                         michaelharris@friendsofanimals.org

                                         *Attorneys for Plaintiff*

37

COMPLAINT